

# COURT OF APPEALS

### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00221-CR

JUAN BLEA                                                                                        APPELLANT

V.

THE STATE OF TEXAS                                                                        STATE

----------

### FROM THE 362ND DISTRICT COURT OF DENTON COUNTY
### TRIAL COURT NO. F-2011-0993-D

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Juan Blea of first-degree felony aggravated assault of a family member.[2] The jury assessed his punishment at five years' confinement, and the trial court sentenced him accordingly. That offense

---

[1]See Tex. R. App. P. 47.4.

[2]See Tex. Penal Code Ann. § 22.02(b)(1) (West 2011).

requires both serious bodily injury and the use of a deadly weapon.[3] In this case, the indictment alleged that Appellant's hand was a deadly weapon. Appellant brings a single issue on appeal, challenging the sufficiency of the evidence that he caused the complainant serious bodily injury rather than bodily injury as well as the sufficiency of the evidence that he used his hand as a deadly weapon. Because the evidence is insufficient to show that Appellant caused serious bodily injury but sufficient to show that he used his hand as a deadly weapon, we reverse the trial court's judgment and remand this case to the trial court with instructions (1) to modify the judgment to delete the conviction for first-degree felony aggravated assault of a family member and to instead reflect a conviction for second-degree felony aggravated assault of a family member, based on Appellant's use of a deadly weapon, and (2) to conduct a new trial on punishment for the second-degree felony.[4]

**Brief Summary of the Facts**

On the date of the offense, July 21, 2010, the complainant and Appellant had a small daughter and shared a bedroom in his parents' apartment. While Appellant and complainant were not married, they did marry about two years later.

---

[3]*Id.*

[4]*See id.* § 22.02(a)(2)–(b).

A couple of weeks before the assault, Appellant had separated from the complainant and moved in with a friend. On July 20, the complainant spent time with a male friend from school. At trial, she did not remember whether she returned home late that night or the next morning. Appellant visited the apartment that the complainant shared with his parents between 10:00 a.m. and noon on July 21 and was in a good mood. But he saw a hickey on the complainant's neck, and when she refused to tell him "where it was from," he became angry. When she finally told him "who [the hickey] was from," he hit her in the face with his hand. They were in the kitchen. At trial, she did not remember whether his hand was open or in a fist. In her testimony, the complainant denied falling, but in her written statement, she had said that she had fallen. She admitted in her testimony that in her written statement, she had said that Appellant had told her that he was going to kill her.

The complainant testified that Appellant hit her only once. When the prosecutor suggested that Appellant had continued to hit her and had asked where their daughter was, the complainant corrected him, stating, "[A]fter he first hit me, she started getting fussy. I told him to leave me alone and I wanted to put her asleep (sic) because I didn't want her around all this and us fighting."

After the complainant gave their daughter a bottle and put her to bed in the bedroom, the couple began fighting again in the living room. Appellant hit her in the side. She testified that he hit her more than once and used both his fist and his open hand. She said that he might have kicked her with his foot and also

3

testified that she had been in a lot of pain after the assault. The prosecutor reminded her that in her written statement, she had said that she was in a "ton" of pain. The pain was in her back and her chest. The prosecutor asked, "Did you feel like something had been broken or terribly injured as a result of this?" The complainant responded, "Yes."

The child woke up, so Appellant stopped hitting the complainant, and she told him that either he or she needed to go buy diapers. Appellant left the apartment and returned with the diapers. The complainant did not call the police while he was gone. When the prosecutor asked her why, she responded, "Because I didn't want to." She said that she had been scared and had not known how Appellant would act, and she had not wanted anyone to know what had happened. When Appellant returned, he and the complainant argued verbally. The prosecutor asked her whether it was evident that she was in pain. She testified that the pain had not set in yet and that she did not tell Appellant that she was in pain.

After Appellant left, the complainant lay down with their daughter, took a bath, cleaned up, and then called Appellant's parents and asked them to come home from work, stating that she had fallen down the stairs. After Appellant's parents saw her, his father called the police.

Officer Tim Adamo, who had been a police officer for twenty-three years by the time of trial, called for an ambulance after he arrived at the apartment. He described the complainant's injuries:

4

The first time I contacted her, she had visible injuries. I could see scrapes, lacerations on her face. She had her—under her left eye was bruised and had a cut on it. I saw a mark on her arm, as well, like a redness and early set of bruising.

. . . .

She was on the couch in the front room.

. . . .

. . . [. S]he was in quite a bit of pain. She was, like, with one arm holding her ribs, her chest, her stomach area.

. . . .

. . . . She said she had a hard time breathing, had a lot of pain.

. . . .

. . . . I was trying to get a statement from her, an affidavit, but she had a lot of difficulty writing the statement.

She tried to get up from the couch at one point and she fell back to the couch in pain and that's when I called for a medic.

## Sufficiency of the Evidence

Appellant contends that the evidence is insufficient to show that (1) he caused serious bodily injury and (2) his hand was used as a deadly weapon. In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine

5

whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[5]  Section 22.02 of the penal code provides,

> (a) A person commits an offense if the person commits assault as defined in § 22.01 and the person:
>
> > (1) causes serious bodily injury to another, including the person's spouse; or
>
> > (2) uses or exhibits a deadly weapon during the commission of the assault.
>
> (b) An offense under this section is a felony of the second degree, except that the offense is a felony of the first degree if:
>
> > (1) the actor uses a deadly weapon during the commission of the assault and causes serious bodily injury to a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code[.][6]

Section 22.01 provides,

> (a) A person commits an offense if the person:
>
> > (1) intentionally, knowingly, or recklessly causes bodily injury to another . . . ;
>
> > . . . .
>
> (b) An offense under Subsection (a)(1) is a Class A misdemeanor . . . .[7]

---

[5]*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

[6]Tex. Penal Code Ann. § 22.02(a)–(b).

[7]*Id.* § 22.01 (West Supp. 2014).

"Bodily injury" is defined as "physical pain, illness or any impairment of physical condition."[8]  "Serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."[9]  The Texas Court of Criminal Appeals has explained that

> [b]y virtue of the fact that the Penal Code provides a different definition for "bodily injury" from "serious bodily injury", though often a matter of degree, we must presume that the Legislature intended that there be a meaningful difference or distinction between "bodily injury" and "serious bodily injury."  Understandably, this means that where the issue is raised, the issue must be determined on an ad hoc basis.[10]

And our sister court in El Paso has explained that

> bodily injury cannot be elevated to serious bodily injury by postulating potential complications which are not in evidence.  The [S]tate must present evidence that the [complainant] suffered bodily injury that created a substantial risk of death.  In other words, the [S]tate must present relevant and probative evidence from which the trier of fact could infer beyond a reasonable doubt that the injury itself created an appreciable risk of death.[11]

The complainant's mother, Jennifer, saw her in the hospital.  Jennifer testified that she noticed only the bruising and redness of her daughter's right eye.  At trial, Jennifer did not remember whether her daughter had had any

---

[8] *Id.* § 1.07(a)(8).

[9] *Id.* § 1.07(a)(46).

[10] *Moore v. State*, 739 S.W.2d 347, 349 (Tex. Crim. App. 1987).

[11] *Hernandez v. State*, 946 S.W.2d 108, 112 (Tex. App.—El Paso 1997, no pet.) (citations and internal quotation marks omitted).

7

trouble breathing.  Jennifer did take photographs of the complainant over a period of time, and the photographs revealed developing bruising over her face and body.  Although Jennifer testified on direct examination that the complainant was unable to walk in the hospital and for a month afterward, on cross-examination, she admitted that the complainant could stand and walk even while still in the hospital.

The complainant did not work at her waitressing job for a month after the assault.  When she returned, she switched from waitressing to acting as hostess.  Jennifer testified that the job change occurred because the doctor had told the complainant not to lift more than twenty-five pounds.  The complainant, however, testified,

Q      Did you resume your duties as a waitress?

A      I decided to be a host.

Q      Why is that?

A      Just so I didn't have to deal with a lot of people.  I didn't want to go back to doing waitressing just yet.

Q      Because you didn't want to interact with people?

A      That, and everybody at Champps kind of knew what happened, kind of the regulars.  That was just kind of my way of avoiding everybody.

She also testified,

Q      You don't really want to be here, do you?

A      No.

Q       Now, when you were taken to the hospital, were you ever in the ICU, or do you know?

A       Not that I know of.

Q       Just in a regular room?

A       Yes.

Q       Do you have any serious permanent disfigurement as a result of this incident?

A       No.

Q       As a result of this incident, did you have a protracted loss of the use of any bodily member or organ?

A       No.

Q       Have you fully recovered?

A       Yes.

Q       Were you able to get up and be out and about some the week after that?

A       The week after the hospital?

Q       Yeah, after they let you go home.

A       Yeah.

Q       Okay. I mean, you could get up and go do something, right?

A       Yeah, yeah.

In response to the prosecutor's asking her the meaning of "protracted loss or impairment of the function of any bodily member or organ," the complainant said that she did not know a specific definition, but that she "probably would know that" and "if [she] did have that, wouldn't a doctor tell [her]?"

The trial court admitted State's Exhibits 18 and 19, hospital records, but after reconsideration, withdrew the exhibits. The court reporter erroneously included those two exhibits in the record, but both the State and Appellant conscientiously asked this court not to consider those exhibits because they were never before the jury. We granted their request and have not considered those exhibits.

The complainant's injuries included two fractured ribs and a fractured maxillary sinus bone. She was kept in the hospital for four days and then "medically cleared for discharge." Kristie Brown, a nurse practitioner at Parkland Hospital, testified concerning the complainant's medical treatment. Brown testified that the complainant had a collapsed lung, but it had already been treated when Brown met the complainant the morning after her admission to the hospital. Brown explained that a person with a collapsed lung "can have trouble breathing, and it can affect blood pressure, vital signs that [medical professionals] look at." Although the complainant had testified that "they said my liver was lacerated, or something," no other evidence of a lacerated liver was presented to the jury. Brown did testify that there was an injury to the complainant's liver and an injury in her chest. Brown admitted that she was repeating the radiologist's opinion, and the trial court sustained Appellant's objection to her testifying about anything somebody else did. But the trial court did not instruct the jury to disregard. Brown testified that she checked for peritonitis or other problems caused by a liver injury; none was discovered.

10

There was no evidence that any injury to the complainant's liver was a serious bodily injury.[12] The following exchange occurred:

Q    So at all times, her liver was functioning and doing what it was supposed to be doing?

A    Yes, sir.

Q    And—all right.  Same with her lungs?  I mean, she could breathe, right?

A    Yes, sir, she was breathing.

Q    And I assume you tested her blood for oxygen level?

A    Yes, sir.

Q    And I guess her blood was—her lungs were working like they were supposed to?

A    Yes, sir.

Q    I mean, they were providing enough oxygen to her?

A    Yes, sir.

Q    Now, on the broken ribs, what treatment was given to her for the broken ribs?

A    Pain medication and respiratory, what we call incentive spirometry, just deep-breathing exercises, and pain medication.

Q    When we hear broken ribs, we think of something sticking through the skin, something like that.

         The rib was, I guess, still intact, for want of better words, but there was a fracture in it?

_____

[12] *See id.* at 111–13 (holding that a 1-centimeter laceration of the liver was unlikely to cause death and not serious bodily injury).

11

A        There was a fracture in it. What alignment it had, I would have to review the chest x-ray. I don't remember.

Q        In any event, there was nothing done to tape her up or set any fractures or have any surgery regarding the ribs?

A        That is correct.

Q        Okay. And would the same be true of the maxillary sinus?

A        That's correct. Due to the swelling, they saw her—we recommended that she be seen in clinic after she was discharged home from the hospital.

Q        But no surgery or any procedures were done to repair that damage?

A        That's correct.

Q        It just healed on its own?

A        That is correct.

The only evidence that the complainant could have suffered serious bodily injury arose from the State's inquiry whether "any injury to the liver [is] treated seriously or minimally" by Brown's "profession." She replied that they are treated seriously because

[i]njuries to the liver can cause a patient to bleed to death very quickly. Knowing that there is an injury to the liver and why it is and whether it is actively bleeding or has developed a blood clot to the liver makes a decision point for what the surgeons do and what we do for the patient.

But there was no evidence that the complainant suffered from such a condition.

The prosecutor then asked whether "lungs [are] treated seriously or minorly." Brown replied, "Seriously." When asked to explain why lungs are treated seriously, she replied, "Because if we can't control our oxygenation, we

12

need oxygen to live, and you can die from that." But Brown did not testify that the complainant suffered from such a condition. No one did. Indeed, Brown monitored the complainant to determine whether a substantial risk of death or any risk of death developed from any injury, and it did not.

Considering all the evidence, we hold that there is no evidence from any source that would allow a jury to conclude or infer beyond a reasonable doubt that the complainant's injuries created a substantial risk of death.[13]

We must next consider whether the complainant suffered permanent disfigurement or protracted loss or impairment of the use of a bodily member or organ.[14] She testified that she had suffered neither. The only suggestion of such loss or impairment is Jennifer's testimony that the doctors told the complainant not to lift more than twenty-five pounds. Jennifer did not say how long the limitation was to last but said that it was because of the complainant's ribs. Jennifer also agreed that "we don't know whether or not [the complainant] was physically capable [of lifting], but she followed their advice."

The complainant testified that she was fully recovered. She also testified that she was able to go out and about some as soon as she was released from the hospital.

The *Moore* court instructs us that

---

[13]*See* Tex. Penal Code Ann. § 1.07(a)(46).

[14]*See id.*

13

given the common meaning of the word "protracted," the complainant's mother's testimony, on which the State relies, that the complainant was bedridden and that it was at least a week "before he could really go out and see people," does not even come close to establishing that the injury the complainant sustained to his back was either continuing, dragged out, drawn out, elongated, extended, lengthened, lengthy, lingering, long, long-continued, long-drawn, never-ending, ongoing, prolix, prolonged, or unending.[15]

We have carefully examined the record. There is no evidence that the complainant suffered serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ.[16] We therefore hold that the evidence is insufficient to support the element of serious bodily injury.

But the evidence is sufficient to support the deadly weapon finding. Testimony touching on whether Appellant's hand was a deadly weapon in the manner of its use or intended use included that of the complainant and that of Officer Adamo, the responding police officer. The complainant testified that after Appellant struck her with his hand, knocking her down, he said that he was going to kill her. Officer Adamo testified on direct examination by the prosecutor,

Q    [C]an a person's hand be a deadly weapon?

A    Yes, it can.

. . . .

Q    [D]o you feel that someone's hands are capable of causing death or serious bodily injury?

---

[15]739 S.W.2d at 352.

[16]See Tex. Penal Code Ann. § 1.07(a)(46).

14

. . . .

A     Yes, they are very capable.

Appellant's statement to the complainant that he was going to kill her was some evidence of his intent to use his hand as a deadly weapon. Officer Adamo's testimony was evidence that would allow a rational trier of fact to conclude beyond a reasonable doubt that, in the manner of its intended use, Appellant's hand was capable of causing death or serious bodily injury. Accordingly, we hold that the evidence is sufficient to support the jury finding that Appellant's hand was a deadly weapon in the manner of its intended use but that the evidence is insufficient to support the serious bodily injury finding. We therefore sustain in part and overrule in part Appellant's sole issue on appeal.

**Conclusion**

Because the State proved only second-degree aggravated assault of a family member beyond a reasonable doubt, that is, it proved that Appellant committed an assault against the complainant and used a deadly weapon during its commission, we reverse the trial court's judgment in part. We remand this case to the trial court with instructions to (1) modify its judgment to delete the first-degree felony conviction of aggravated assault of a family member and to instead reflect a second-degree felony conviction for aggravated assault of a

15

family member through the use of a deadly weapon and (2) conduct a new trial on punishment.[17]

                                             /s/ Lee Ann Dauphinot
                                             LEE ANN DAUPHINOT
                                             JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GABRIEL, JJ.

LIVINGSTON, C.J., filed a dissenting opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: February 5, 2015

---

[17] *See Bowen v. State*, 374 S.W.3d 427, 432 (Tex. Crim. App. 2012).